UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HITACHI MEDICAL SYSTEMS | ) | Case No. 5:07CV02035 |
| AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | AMENDED[1] MEMORANDUM |
| | ) | OPINION AND ORDER |
| HORIZON MEDICAL GROUP, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the Court is a motion by defendants David Branch and Daniel Branch (the "Branches") for summary judgment on the fraud cause of action brought against them by plaintiff Hitachi Medical Systems America, Inc. ("Hitachi" or "Plaintiff"). (Doc. No. 126.) Also before the Court is the Branches' motion to strike certain evidence submitted by Hitachi in support of its opposition to summary judgment. (Doc. No. 165.) Both motions have been briefed fully and are ripe for resolution.

**I. Statement of Facts and Procedural History**

This action arose out of a business relationship between Hitachi and defendant Horizon Medical Group ("Horizon") and its affiliated companies (the "LLCs"). Hitachi sells medical imaging equipment and provides related services. Horizon provided management services, including transcription, billing, collection, personnel, and accounting to the LLCs, which operated as individual MRI centers in Florida, Georgia, and Texas. The Branches were owners and executives of Horizon. Specifically, David Branch was Horizon's CFO and a thirty-

---

[1] This memorandum has been amended for the sole purpose of removing an erroneous statement indicating that Hitachi failed to include a certain citation to the record in its opposition to summary judgment.

three percent shareholder. Daniel Branch was the CEO, and held twenty percent of the company's shares.

In 2002, Hitachi and Horizon entered into a Volume Purchase Agreement ("VPA") and related Service Maintenance Agreements ("SMAs"). Pursuant to the VPA, Horizon agreed to purchase from Hitachi numerous MRI units. The SMAs provided that Hitachi would supply Horizon with ongoing service and maintenance for the MRI units. In return, Horizon agreed to pay Hitachi a monthly fee. The VPA and SMAs later were expanded to encompass a total of eighteen (18) MRI units at various locations in Florida, Georgia, and Texas.

According to Hitachi, Horizon subsequently breached its obligations under the contracts by failing to make required payments, eventually prompting Hitachi to initiate this litigation. Hitachi filed suit against eighteen business entities including Horizon, the LLCs, and Med Fund LLC (owner of all the LLCs), as well as four individuals, including the Branches. In addition to the breach of contract and unjust enrichment claims asserted against the business defendants, Hitachi charged the Branches with fraud.

The Branches immediately moved to dismiss the fraud claim arguing, inter alia, that Hitachi's pleading failed to comply with Fed. R. Civ. P. 9(b). (Doc. No. 12.) The Court agreed with this argument, finding the pleading deficient, but granted Hitachi leave to amend. (Doc. No. 55.) Hitachi filed its amended complaint (Doc. No. 57), which included allegations that the Branches defrauded Hitachi by, on or about November 11, 2002, directing Horizon employee[2] Dan Hansen to misrepresent Horizon's financial status as solid at a time when the

---

[2] While Hitachi's complaint identified Mr. Hansen as a Horizon employee, the Branches submitted evidence in support of summary judgment indicated that Hansen was an owner, rather than an employee. This distinction, if any, is not material to the outcome of the motion and, therefore, the Court reaches no decision in this regard.

2

Branches knew Horizon was undercapitalized. (Compl. ¶ 96.)[3] Hitachi also alleged that after

Horizon fell behind on payments owed to Hitachi, the Branches made or directed the making of

certain misrepresentations in efforts to induce Hitachi to resume providing service to Horizon.

(Compl. ¶ 101.) Hitachi maintained that these misrepresentations took the form of statements

that Horizon would cure its delinquencies by bringing its accounts current when, in fact, it had

no intention or ability to do so. Hitachi claimed that these misrepresentations occurred (1) during

communications between Mr. Hansen and Hitachi's Richard Katz in early 2004; (2) in

conversations between Daniel Branch and Hitachi's Barbara Halloran in April 2005; and (3)

sometime in August 2005 after Horizon's accounts were placed on service hold. (Compl. ¶ 102.)

The Branches again moved to dismiss the complaint. (Doc. No. 59.) The Court

denied the Branches' motion to dismiss, finding the allegations of fraud were stated with

sufficient particularity. (Doc. No. 78.) With discovery now complete, the Branches seek

summary judgment arguing, inter alia, that Hitachi has failed to come up with evidence to

support its fraud charges. (Doc. No. 126.) The Branches also assert that the fraud claim is legally

defective because (1) it is premised upon the same conduct underlying Hitachi's breach of

contract claims, and Hitachi has failed to establish any duty owed by the Branches independent

of the contracts; and (2) Hitachi has failed to establish separate damages arising from the alleged

fraud apart from those suffered as a result of the alleged contractual breach and, therefore, the

claim runs afoul of the economic loss doctrine.

Hitachi filed opposition to the Branches' motion for summary judgment. (Doc.

No. 160.) The Branches filed a reply brief (Doc. No. 164), along with a motion to strike certain

evidence submitted by Hitachi in support of its opposition. (Doc. No. 165.) Hitachi filed a

---

[3] All record references to the Complaint are to the Amended Complaint filed November 29, 2007. (Doc. No. 57.)

3

response to the motion to strike. (Doc. No. 175.)

In addition, the Branches filed a motion for oral argument (Doc. No. 157) relative to their motion for partial summary judgment. Because the Court finds no need for oral argument, that motion is denied.

## II. Law and Analysis

### A. Motion to Strike

The Branches moved to strike, in whole or in part, the affidavits of Dan Hansen (Doc. No. 160-4) and Richard Katz (Doc. No. 160-11) submitted by Hitachi in support of its opposition. Rule 56(e) requires that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). "Affidavits composed of hearsay and opinion evidence do not satisfy Rule 56(e) and must be disregarded." *State Mut. Life Assurance Co. of Am. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir. 1979) (citations omitted).

"On a motion for summary judgment, a court must not consider those parts of an affidavit that are insufficient under Rule 56(e)." *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998) (citing *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987)). The Court may strike or simply disregard inadmissible evidence when addressing a motion for summary judgment. *See Collazos-Cruz v. U.S.*, 117 F.3d 1420 (6th Cir. July 3, 1997) (unpublished) (citing *Noblett v. Gen. Elec. Credit Corp.*, 400 F.2d 442, 445 (10th Cir.), *cert. denied*, 393 U.S. 935 (1968)); *see also Rus Inc. v. Bay Indus.*, 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003) ("To the extent that an affidavit or declaration contains material that does not comply with Rule 56(e), the Court may strike those portions or disregard them."); *Bailey v. USF*

4

*Holland, Inc.*, 444 F. Supp. 2d 831, 842 (M.D. Tenn. 2006) ("a court may strike portions of affidavits – or affidavits in their entirety – which do not comply with Rule 56(e).")[4]

In the Court's view, only one issue raised in the motion to strike merits any attention at this time. With respect to the Hansen affidavit, the Branches take issue with, inter alia, paragraph 9. In that paragraph, Hansen stated, "In my opinion, Dan Branch did not sign the agreement because once Hitachi restored service, he had what he wanted. Delay was one of the Branches' tactics." (Hansen Aff., ¶ 9.) Hansen clearly identified this statement as representing his personal opinion about Daniel Branch's alleged motivation for not signing a certain agreement. The portion of paragraph 9 stating that "[d]elay was one of the Branches' tactics[,]" also appears to represent Mr. Hansen's personal opinion, since the affidavit includes no facts suggesting that Hansen had personal knowledge of other instances of the Branches using delay as a tactic.

"Pursuant to Fed. R. Evid. 701, lay opinion is admissible when it is based upon personal knowledge or observation and it is helpful to understanding the witness' testimony or determining a fact in issue." *Holt v. Olmsted Twp. Bd. of Trustees*, 43 F. Supp. 2d 812, 819 (N.D. Ohio 1998). However, Hitachi does not offer Hansen's affidavit as a lay opinion; indeed, because this is a simple common law fraud claim, no opinion testimony is necessary. Instead, Hitachi attempts to use Hansen's "opinion" to support the factual merits of its fraud claim. Specifically, Hitachi claims that Hansen's opinion that Daniel Branch did not sign the agreement

---

[4] While there are cases clearly holding that using Rule 12(f) to strike an affidavit submitted on summary judgment is improper because neither an opposition to summary judgment, nor an affidavit, is a pleading as defined by the rules, *cf. Burlington N. Santa Fe Railway Corp. v. Dakota Missouri Valley and W. R.R., Inc.*, 347 F. Supp. 2d 708, 727 (D.S.D. 2004), there can be no dispute that only admissible evidence can be considered in evaluating a motion for summary judgment. Fed. R. Civ. P. 56(e). In the Court's view, the appropriate remedy is to disregard, rather than to strike, the offending portion(s) of the affidavit. *See, e.g., Jones v. Marcum*, 197 F. Supp. 2d 991, 1007 n.13 (S.D. Ohio 2002). The difference, however, is rather technical and of no substantive effect.

because Mr. Branch already "had what he wanted" supports an inference of fraudulent intent on the part of Daniel Branch. It is clear, however, that Mr. Hansen does not possess personal knowledge that, as a matter of fact, Daniel Branch refused to sign the agreement because Hitachi already had resumed servicing Horizon's equipment. If he did, surely he would have said so, rather than expressly labeling his statement as one of opinion. Rather, he is merely speculating as to Mr. Branch's reasons for refusing to sign. Such speculation is not admissible, since it is not a fact within Mr. Hansen's personal knowledge. Fed. R. Civ. P. 56(e). Accordingly, it is disregarded.

In addition, Mr. Hansen's generalization regarding "delay" being one of the Branches' "tactics" lacks foundation. The affidavit describes one specific delay by Daniel Branch in signing an agreement that was exchanged between Mr. Hansen and Mr. Katz. (Hansen Aff. ¶ 8.) That statement clearly was made from Hansen's personal knowledge, and therefore is admissible. However, his attribution of "delay" as a general tactic employed by both Daniel and David Branch clearly lacks foundation, since Mr. Hansen's affidavit does not describe any other alleged instances of delay by either of the Branches (and none at all by David Branch). While Mr. Hansen might possess personal knowledge of other instances of delay that could support such a generalization, no such facts are set forth in his affidavit. Consequently, paragraph 9 of Mr. Hansen's affidavit is inadmissible under Fed. R. Evid. 602 and, therefore, shall be disregarded by the Court.[5] The remaining portions of the Hansen and Katz affidavits, to the

---

[5] The remaining issues raised by the motion to strike are not relevant and, therefore, need not be ruled upon. Paragraphs 13 and 14 of Hansen's affidavit, and paragraphs 10, 11, and 12 of the Katz affidavit, concern the purported sale of Horizon's assets. This purported event took place, if at all, long after the allegedly fraudulent misrepresentations that are the subject of the instant motion and, indeed, it appears, after this litigation commenced. (*See* Daniel Branch Dep., Doc. No. 127, at 9:6-8; 22-23) (potential sale pending as of May 15, 2008). Hitachi never even suggests that the possible sale of some or all of Horizon's assets was related to the alleged fraudulent misrepresentations. Accordingly, such information is of no aid to Hitachi in proving any element of the alleged fraud

6

extent relevant, appear to be backed by the personal knowledge of the declarants, and shall be considered.

### B. Motion for Partial Summary Judgment

#### 1. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The entry of summary judgment is not a disfavored procedural shortcut, but instead is mandated by "the plain language of Rule 56(c) . . . after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing summary judgment may do so with "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves. *Id*. at 324. The nonmovant must show more than a scintilla of evidence to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment."

---

since the most recent representations at issue allegedly were made in August 2005.

*Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In addition, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, "so long as the movant relies upon the absence of an essential element in the pleadings, depositions, or answers to interrogatories. *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993) (citing *Celotex*, 477 U.S. at 324).

In reviewing a motion for summary judgment, the Court must view the evidence in a light most favorable to the nonmoving party and determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. *Id.* at 252.

### 2. Fraud

To prove fraud, a plaintiff must demonstrate: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation; and (6) a resulting injury proximately caused by the reliance. *Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475 (1998); *ABM Farms, Inc. v. Woods*, 81 Ohio St. 3d 498, 502 (1998).

Before reaching the factual merits of Hitachi's claim, the Branches assert that the fraud cause of action suffers from at least two legally fatal defects. First, the Branches contend the fraud claim is barred by the economic loss doctrine, which prevents a party from recovering

in tort purely economic losses resulting from "a breach of duties assumed only by agreement." *Corporex Dev. & Constr. Mgmt. Inc. v. Shook, Inc.*, 106 Ohio St. 3d 412, 414 (2005). According to the Branches, this failure by Hitachi to identify a specific duty owed by the Branches independent of the contract precludes the assertion of fraud.

This argument was addressed directly in the Court's memorandum opinion and order denying the Branches motion for summary judgment.[6] (Doc. No. 78, at 8-9.) As stated therein, claims for fraudulent inducement – like the one asserted by Hitachi – are not barred by the economic loss rule because such claims implicate "a general duty to avoid wrongful conduct that induces a party to enter into a contract." *Onyx Envt'l Sevs., LLC v. Maison*, 407 F. Supp. 2d 874, 879 (N.D. Ohio 2005) (citing *Mesaros v. FirstEnergy Corp.*, No. 5:04 CV 2351, 2005 WL 2460739, at *8 (N.D. Ohio Oct. 5, 2005)); *see also Marine Direct v. Dougherty Marine, Inc.*, No. 2:06-cv-0100, 2007 WL 81842, at *2 (S.D. Ohio Jan. 8, 2007).

The Branches also posit that Hitachi failed to identify separate damages flowing from the alleged fraud and, therefore, cannot maintain concurrent claims for fraud and breach of contract. While the Court agrees with the Branches that Hitachi's claimed fraud damages are identical to its contract damages,[7] under the circumstances of this case, that fact does not bar the fraud claim against the Branches. Here, Hitachi asserts only breach of contract and unjust enrichment claims against Horizon and the other business defendants. It does not accuse those defendants of fraud. Conversely, Hitachi asserts only fraud claims against the Branches; they are

---

[6] Remarkably, both parties completely ignore the Court's prior ruling on this very topic.
[7] Hitachi maintains that its hiring of additional service personnel represents a type of damage peculiar to its fraud claims against the Branches. This position is without merit. Hitachi contends that it hired additional employees to provide service to Horizon and the LLCs based upon the numerous SMAs agreed to by the parties. The SMAs, of course, are contracts and, therefore, any damages incurred as a result their breach – including hiring expenses directly associated with those contracts – would be recoverable as consequential damages. *See World Metals, Inc. v. AGA Gas, Inc.*, 142 Ohio App. 3d 283, 289-90 (9th Dist. 2001) (citations omitted).

not targeted by Hitachi's contract claims. Accordingly, as the Court held in its order denying the Branches' motion to dismiss, the fraud claim is not redundant of the contract claims vis-à-vis the Branches, and therefore is not precluded by the failure to allege separate damages. (Doc. No. 78, at 8.)[8]

Having rejected the Branches' legal arguments in support of summary judgment, the Court turns to their contention that Hitachi has failed to present admissible evidence sufficient to create a genuine issue of material fact as to each element of fraud. Here, again, it is important to distinguish between fraud in the inducement and promissory fraud. As defined and analyzed in the Court's memorandum opinion denying the Branches' motion to dismiss, the fraud claim asserted by Hitachi was one for fraudulent inducement, not promissory fraud.[9] (Doc. No. 78, at 6-7.) Hitachi claims that it was fraudulently induced through several actions taken by or at the direction of the Branches.

### a. Pre-Contract Fraudulent Inducement by Hansen at Branches' Direction

Hitachi alleged that, prior to entering contracts with Horizon, it asked for representations from Horizon regarding its ability to pay. (Compl. ¶ 94.) Hitachi further alleged

---

[8] As the Court also noted in its previous decision, to the extent any risk of double recovery exists in this case, none will be permitted. (Doc. No. 78, at 8 n.4.) "Disallowing double recovery, however, does not mean that a party cannot bring both a fraud claim and a breach of contract claim when an additional duty has been breached causing damages." *Bonner Farms, Ltd. v. Power Gas Mktg. & Transmission, Inc.*, No. 5:04CV2188, 2007 WL 2463247, at *11 (N.D. Ohio Aug. 28, 2007) (citation omitted).

[9] To the extent Hitachi attempts to assert promissory fraud, which it did not plead in the complaint, such a claim is completely without merit. Promissory fraud occurs "where an individual makes a promise concerning future action, occurrence, or conduct and, at the time he makes it, has no intention of keeping the promise. *Williams v. Edwards*, 129 Ohio App. 3d 116 (1998). Because the Branches, as individuals, were not parties to, and did not sign, the contracts at issue, they did not make any personal promises to Hitachi in connection with the signing of the contracts. For purposes of promissory fraud, the promise of contractual performance was made by Horizon, not the Branches. Thus, from a promissory fraud perspective, the Branches' intention is irrelevant. It appears undisputed that the contracts, which initially were agreed to in 2002, were in fact performed by Horizon for some period of time before it fell behind on payments. Accordingly, any contention that the Branches (or Horizon) committed promissory fraud (i.e., lacked the then-present intention to perform when the contracts were signed) is unsupportable.

that the Branches exercised complete control over the management of Horizon. (*Id*. ¶ 95.) According to Hitachi, in response to its request, the Branches directed Dan Hansen to misrepresent Horizon's financial standing as solid at a time when the Branches knew that Horizon and the LLCs were "grossly undercapitalized and overextended." (*Id*. ¶ 96.)

The Branches seek summary judgment as to this claim arguing that (a) this is essentially a claim that the corporation, i.e., Horizon, defrauded Hitachi, not the Branches as individuals; (b) Hitachi never asked for any financial information from Horizon prior to forming the contracts; (c) Dan Hansen, not the Branches, was responsible for management decisions regarding Horizon's relationship with Hitachi; (d) Hitachi has failed to identify any financial information that was the subject of a misrepresentation; and (e) there is no evidence that the Branches directed Hansen to make any type of misrepresentation to Hitachi.

In arguing that Hitachi's fraud claim is directed at Horizon, the corporate entity, rather than the Branches as individuals, the Branches correctly note that they did not personally sign or guarantee Horizon's contracts with Hitachi. But those facts merely establish that Hitachi does not possess a direct contract cause of action against the Branches. No legitimate dispute exists as to that question. Rather, the issue is whether the Branches may be held liable for fraud based upon the allegations levied by Hitachi. The answer to that question, at least as a legal matter, is yes. "Directors and corporate officers generally may be personally liable for fraud even though the corporation may be liable also." *Prymas v. Kassai*, 168 Ohio App. 3d 123, 136 (8th Dist. 2006) (quoting *Centennial Ins. Co. of N.Y. v. Vic Tanny Int'l of Toledo, Inc.*, 46 Ohio App. 2d 137, 141 (6th Dist. 1975)). "To fasten personal liability upon a corporate officer for fraud, it must be shown that he knew the statement was false, that he intended it to be acted upon by the

parties seeking redress, and that it was acted upon to the injury of the party." *Centennial*, 46 Ohio App. 2d at 141. David Branch and Daniel Branch both were corporate officers of Horizon, and Hitachi has adequately pleaded fraud claims against them. Accordingly, under Ohio law, they may be held liable individually for fraud, even in the absence of a direct contractual relationship with Hitachi.

Having settled the legal question, the Court turns to whether Hitachi has put forth sufficient evidence of fraud against the Branches to withstand summary judgment. The Branches point out four purported factual deficiencies in Hitachi's pre-contractual fraud claim. In its opposition to the Branches' motion, Hitachi virtually abandons this claim, offering no rebuttal to the Branches' specific factual arguments (and choosing instead to focus on its claims that misrepresentations were made during the post-contractual period in response to threatened service holds). The Court agrees with all four of the Branches' arguments, each of which represents an independent basis for granting summary judgment in their favor on the pre-contractual fraud theory.

Hitachi's pre-contractual fraud accusation posits that, during negotiations, Hitachi requested information from Horizon regarding its financial status and ability to pay. According to Hitachi, the Branches, who controlled Horizon's management, told Dan Hansen to misrepresent Horizon's financial status to Hitachi as solid, when the Branches knew that Horizon was "overextended" and "undercapitalized." Thus, Hitachi's theory of fraud requires proof of at least four factual predicates: (1) that Hitachi asked Horizon for representations regarding its finances prior to entering into the contracts; (2) that the Branches, exercising control over the corporation, instructed Dan Hansen to commit fraud; (3) that Hansen affirmatively

12

misrepresented facts about Horizon's finances to Hitachi; and (4) that Horizon was, at that time, financially unsound, and the Branches knew or recklessly ignored that fact. The record is devoid of evidence supporting any of these four allegations.

Hitachi makes no effort to identify any financial information it requested from Horizon before agreeing to the VPA and the SMAs. Moreover, Hitachi presents no evidence of any instructions by the Branches to Hansen involving pre-contractual misrepresentations. Hansen's affidavit focuses solely on post-contractual actions. (*See* Pl.'s Opp'n to Mot. for Summ. J., Ex. C, Doc. No. 160-4.) In addition, Hitachi fails to identify any purported pre-contract misrepresentation by Hansen or anyone else. Nor does Hitachi offer evidence supporting its contention that Horizon was financially unsound back in 2002 when the parties agreed to the contracts now at issue. For this host of reasons, Hitachi's pre-contractual fraud claim lacks any evidentiary support, and the Branches are entitled to summary judgment on that theory.

### b. Post-Contract Fraudulent Inducement

In the complaint, Hitachi alleged that after falling behind on payments due under the SMAs, the Branches, "by and through their own communications and/or by and through the actions of Horizon's employees, induced [Hitachi] to continue to provide service to Horizon by representing to [Hitachi] that Horizon would bring its delinquent accounts current." (Compl. ¶ 101.) According to Hitachi, such representations were made (a) in January, February, March, and April 2004 during communications between Dan Hansen and Richard Katz; (b) in April 2005 during communications between Daniel Branch and Barbara Halloran; and (c) in August 2005, when Horizon personnel requested that Hitachi resume service after Horizon's accounts had been placed on service hold. (*Id*. ¶ 102.) Hitachi claims that these representations were fraudulent. To

13

support this contention, each of the representations must have been made with fraudulent intent (i.e., Horizon had no intention of bringing the accounts current), and the maker of the representation must have known of the falsity (i.e., that, in fact, the accounts would not be brought current), or acted with such reckless indifference thereto that knowledge can be inferred. Of course, it is not fraud for a party to represent truthfully that it intends to pay, only later to find itself unable to do so.

### i. Fraudulent Communications between Dan Hansen and Richard Katz

Hitachi maintains that Mr. Hansen made fraudulent misrepresentations to Mr. Katz during conversations in early 2004. In his affidavit filed in support of Hitachi's opposition to summary judgment, Katz stated that he had conversations and exchanged written correspondence with Dan Hansen between January and April 2004. (Katz Aff. ¶¶ 3-4.) Katz further indicated that "Horizon [presumably through Hansen] represented that it would remain current with its monthly payment obligations to HMSA[,]" and that, based upon these representations, Hitachi reinstated service on Horizon's accounts. (*Id*. ¶¶ 7-8.) Asked about the alleged misrepresentations during his deposition, Katz answered as follows:

Q. What's the nature of that fraudulent activity?

A. Representations that they knew at the time they were made were not true and not possible of being performed.

Q. And what would those representations have been?

A. That they were in a sound financial – or in a position of restructuring and that they were infusing new – infusion of cash – capital and that they would be in a position to liquidate the obligations that were owing to Hitachi.

[* * *]

Q. What evidence do you have that these statements you contend took place and

14

that you contend were fraudulent were done with ill will?

A. Just my knowledge of the conversations that was [sic] had between myself and Dan Hansen and Dan – one of the Branchs [sic].

Q. And what knowledge – what facts do you have to support the allegations that these statements were made with spite and with malice?

A. Failure to perform based on the representations that were made.

(Katz Dep. at 10:10-20; 20:4-14.)

This evidence is far from sufficient to sustain Hitachi's fraud claim. Katz never identified a specific representation of fact that was false when made. Rather, he claims only that Horizon, via Hansen, told him that it would stay current on payments, prompting Hitachi to lift the service hold it had placed on Horizon's accounts. None of the admissible evidence proffered by Hitachi actually supports the inference that Hansen (or, by extension, the Branches) knew, contrary to his own representation to Katz, that Horizon in fact would not remain current on its payment obligations. [10]

Rather than providing direct evidence that the Branches (or even that Hansen) knew Hansen's representations were false, Hitachi attempts to charge the Branches with fraud by arguing that Hansen's representations to Katz regarding payment were made with such reckless indifference as to Horizon's actual ability to pay that knowledge may be inferred. In order to sustain this theory, Hitachi must show that Horizon's financial situation was so dire in early 2004 that the representation to Katz by Hansen that Horizon intended to pay its obligations was so reckless (i.e., its ability to pay was so dubious) that the Branches' knowledge of the falsity may

---

[10] It appears that Hitachi offered paragraph 9 of the Hansen affidavit in an attempt to support this inference. The Court concluded, however, that this portion of Hansen's affidavit was inadmissible and, therefore, could not be considered. Even if considered, however, the Court finds that Hansen's statement of "opinion" about Daniel Branch's reason for refusing to sign a certain agreement, and his nebulous assertion that "delay" was a "tactic" used by the Branches, fails to create a genuine issue of material fact regarding the Branches' alleged fraudulent intent.

be inferred. But Hitachi fails completely to demonstrate by any competent means such serious defects in Horizon's financial condition at the time of Hansen's communications with Katz.

Hitachi points to Horizon's reliance upon payments from customers (either in cash or via insurance reimbursements) to provide cash flow for operations and argues that this "suggests a lack of capital sufficient to meet Horizon's contractual obligations." This argument makes no sense at all, and Hitachi makes no further effort to explain it.[11] Moreover, Hitachi's citations in support of this assertion are of no help. Hitachi refers to Exhibits D and E attached to its brief, which are copies of audit reports, the most recent of which covers the year ended December 31, 2000. Accordingly, this evidence says absolutely nothing about Horizon's financial condition in early 2004 when the alleged misrepresentations took place. And even if these reports pertained to the relevant time period, Hitachi's undercapitalization claim would remain unsupported because no attempt is made to explain what information in those reports actually supports Hitachi's position. The Court is under no obligation to parse the record for evidence that arguably may shed some light on a party's claims. *See Cacevic v. City of Hazel Park*, 226 F.3d 483, 492 (6th Cir. 2000) (citing *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 407, 410 (6th Cir. 1992)) ("the court need not comb through the record to ascertain whether a genuine issue of material fact exists.") That is particularly so where, as here, the evidence submitted is voluminous (the cited audit reports together run to eighty pages) and not facially self-explanatory (nowhere do the reports indicate that Horizon was undercapitalized).

The only other fact offered in support of this fraud claim is that Daniel Branch,

---

[11] This reads like a description of the business model employed by countless businesses engaged in the provision of health care services in the United States. Nowhere does Hitachi suggest that the amount Horizon owed Hitachi for service on the MRI units somehow exceeded what Horizon charged its patients (and it would be patently absurd to operate a business on such a premise). Accordingly, Hitachi's contention that Horizon's use of such a business model somehow suggests that the company was undercapitalized is completely unsupported.

16

Horizon's CFO, did not check the company's cash flow reports. (Pl.'s Opp'n to Mot. for Summ. J., at 23.) This does not support an inference that the Branches knew any of the representations regarding payment were false. To support its recklessness claims, Hitachi must show not just that Horizon was experiencing financial difficulties at the time in question (because this would do no more than establish negligence), but that any reasonable person aware of the company's financial position could not in good faith represent that the company would make good on its future payment obligations. Yet Hitachi submitted no evidence or explanation of what the cash flow reports would have showed if Mr. Branch had looked at them. While Mr. Branch's neglect of the company's financial information arguably could support an inference of recklessness if coupled with facts affirmatively demonstrating that in early 2004, Horizon was so impaired financially that it had no hope of making payments to Hitachi, standing alone it does nothing to bolster Hitachi's fraud claim. As explained previously, Hitachi has failed to present any evidence of grave financial problems at Horizon at the time the representations at issue were made. Consequently, Hitachi's vague assertion that Daniel Branch was ignorant of the Horizon's cash flow situation cannot, without considerably more, defeat the Branches' well-supported summary judgment motion.

More fundamentally, even if Hitachi could show it was defrauded by Hansen's alleged misrepresentation, there is no evidence linking it to either David or Daniel Branch. Katz's affidavit and deposition testimony provide no indication that the Branches were behind Hansen's alleged misrepresentation. Hansen stated in his affidavit that David Branch "told him to work out a deal with Hitachi to have service reinstated[,]" that Hansen "negotiated in good faith with Hitachi" as instructed by Branch, and exchanged draft agreements with Katz that

17

ultimately were not signed by Horizon. (Hansen Aff. ¶¶ 5-8.) None of these facts indicate fraud, either by Hansen or by the Branches. Notably, Hansen never stated that either David or Daniel Branch told him to misrepresent Horizon's finances to Hitachi. Thus, even if Hitachi could establish fraud by Hansen in his dealings with Katz, its claim nevertheless fails because Hitachi has not presented any evidence sufficient to create a genuine issue regarding involvement by the Branches in such misrepresentations. *See Pappas v. Ippolito*, No. 89903, 2008 WL 3135548, at *11 (Ohio App. 8th Dist. Aug. 7, 2008) (where representations were made by one defendant but not the other, summary judgment appropriate as to the defendant having no involvement in the representations).

Finally, another fundamental defect running throughout Hitachi's fraud claim is its failure to present any evidence of the Branches' alleged intent to defraud. Hitachi has presented no direct evidence of fraudulent intent. Because such evidence is almost always difficult to obtain, courts may infer fraudulent intent from the facts and circumstances surrounding the transaction and the relationship of the parties involved. *Stein v. Brown*, 18 Ohio St. 3d 305, 308-09 (1985) (citing *Gleason v. Bell*, 91 Ohio St. 268 (1915)). Review of Hitachi's opposition to summary judgment reveals no facts supporting an inference of fraudulent intent and, indeed, no real effort by Hitachi even to address this element of its fraud claim.[12] On several occasions, Hitachi summarily accuses the Branches of making promises that they never intended to fulfill. (Pl.'s Opp'n to Mot. for Summ. J., at 21, 22.) But in the rare instance where Hitachi

---

[12] Here, a word about Hitachi's brief is worthy of mention. For reasons the Court is unable to comprehend, Hitachi devoted ten pages of its brief (pp. 11-20) to a request that the Court "pierce the corporate veil." Piercing the corporate veil is not even an issue in this motion (which only concerns the fraud count of the complaint) and, in any event, Hitachi is *defending* against the Branches' motion for summary judgment, not affirmatively asking the Court to find anything. In the small portion of its brief discussing the pertinent issue (pp. 20-24), Hitachi fails to perform an element-by-element analysis of its fraud claim and, with only a few exceptions, fails to cite the record in support of its arguments. Rather, its opposition to summary judgment on the fraud claim consists mostly of unsupported argument which, of course, cannot be used to defeat summary judgment.

cites the record in support its accusation, examination of the record fails to produce any evidence supporting this claim. As discussed throughout this memorandum opinion, Hitachi's evidence shows only that promises to pay were made that ultimately went unfulfilled. (*See id*., at 22 n.11.)[13] This does not support an inference of fraudulent intent. Accordingly, no genuine issue of material fact exists as to that element of Hitachi's fraud cause of action.

### ii. Fraudulent Communications between Daniel Branch and Barbara Halloran

Hitachi also alleges it was defrauded in conversations between Daniel Branch and Barbara Halloran during April 2005.[14] Asked about these conversations during her deposition, Ms. Halloran testified:

Q. Can you tell me any of the specifics of any of the conversations that you had with Dan Hansen?[15]

A. I'm not going to answer that because I won't be precise. It's been too long. I don't know.

Q. Well, I'm asking you. It's a yes or no question. Can you tell me any of the specifics of any of the conversations that you had with Dan Hansen?

[* * *]

THE WITNESS: Well, I called asking for money. I can recall that and - -

MR. WEISENSELL: Okay.

THE WITNESS: - - arguing about that he owes us money. I mean, invoice

---

[13] The only record citations regarding the Branches' alleged fraudulent intent appear in footnote 11. The Halloran and Cain depositions, and the Katz affidavit, each of which is discussed in detail in this opinion, collectively show nothing more than unfulfilled promises to pay.

[14] This allegation does not involve David Branch at all and therefore does nothing to bolster Hitachi's fraud claim against him.

[15] The deposition excerpts cited by the parties involve questions about Dan *Hansen*, not Dan *Branch*. Both parties, however, treat this testimony as if it involved Mr. Branch rather than Mr. Hansen. The first question in the sequence concerned Mr. Branch, and thus it certainly is possible that the questions were supposed to be about Mr. Branch, and that the witness thought she was answering questions about him. The Court need not reach any conclusion in this regard, however, because Ms. Halloran's testimony does not provide evidence of fraud by either Mr. Branch or Mr. Hansen.

number, amount, things like that, no, I can't remember.

MR. WEISENSELL: Okay.

Q. So other than being able to tell me that your calls to him were asking for money, you can't tell me any other specifics about those conversations?

A. Other than he promised to pay and they were working on it and they would send us money and - - and all the promises.

Q. Okay. And you can't tell me specifics about when those conversations took place or how long of an additional period of time that he needed to make the payment or any - -

A. No, I don't.

Q. - - of those kind - -

A. No.

Q. - - of details?

A. I can't. I can't tell you that today. I don't know.

[* * *]

Q: Okay. Do you have any knowledge of any fact upon which Hitachi can or does base its contention that Horizon was attempting to mislead Hitachi when they made these statements as opposed to they made promises and the money that they thought was going to come in just didn't come in and, therefore, they couldn't make the payments?

[* * *]

A. No, I can't. I don't know.

(Halloran Dep. at 23:24 – 26:16.)

This testimony provides absolutely no evidence of either fraudulent intent by Daniel Branch (if indeed Ms. Halloran was answering questions about Mr. Branch), or of knowledge of or reckless indifference to the falsity of the representation. To the contrary, the

conversation(s) described by Ms. Halloran appears to be one in which honest promises to pay were made that Horizon ultimately was unable to fulfill. That is not fraud. As discussed previously, Hitachi has come forward with no direct evidence of fraudulent intent (vis-à-vis this conversation involving Ms. Halloran or otherwise), and to the extent its fraud claim is based upon recklessness, it has produced absolutely no contemporaneous evidence suggestive of a complete inability to pay that would render false any representation to the contrary.[16] Consequently, no genuine issue exists regarding Hitachi's fraud claim as premised upon the April 2005 communications between Daniel Branch and Barbara Halloran.

### iii. Fraudulent Communications in August 2005

The Amended Complaint also includes an allegation that Hitachi was defrauded in August 2005 when Horizon personnel requested that Hitachi resume service after Horizon's accounts had been placed on service hold. (Compl. ¶ 102.) Like the other post-contractual fraud allegations (discussed supra in §§ II.B.2.b.i.-ii.), this is a claim that fraud by the Branches induced Hitachi into resuming service. Unlike the others, however, for this allegation the complaint neglected to identify the allegedly fraudulent actor. Nor, in its opposition to summary judgment, does Hitachi attempt to pinpoint any specific actions occurring in August 2005 that support its claim of fraud during that time period.

Giving Hitachi the benefit of the doubt and ignoring its complete failure to identify specific evidence in its opposition to summary judgment, it appears that this allegation is based upon email correspondence in August 2005 between various Hitachi employees and

---

[16] With respect to the fraud claim involving this alleged conversation with Ms. Halloran, Hitachi's opposition to summary judgment does nothing more that cite Ms. Halloran's deposition (the cited portion is reproduced and discussed immediately infra) and a letter memorializing a conversation between Ms. Halloran and Mr. Branch in which Mr. Branch, on behalf of Horizon, "agreed to pay the final payment of $71,986.25 that remains open on Serial #AG036 Las Colinas Open MRI, LLC, located in Irving, Texas." Neither Halloran's testimony, nor the letter, includes any evidence of either fraudulent intent or knowledge of the representation's falsity.

Daniel Branch. (See Pl.'s Opp'n to Mot. for Summ. J., Ex. R, Doc. No. 160-19.) This string of emails, principally between Daniel Branch and Hitachi's Lance Cain, (just like all the other evidence offered by Hitachi) describes a back and forth regarding overdue balances on Horizon's service accounts. In the emails, Hitachi explained its invoicing policy and how Hitachi calculated when a particular invoice was deemed sixty days past due (at which point the account was placed on service hold). Daniel Branch expressed dissatisfaction with what he apparently perceived as Hitachi's "threats" to discontinue service, and also disagreed with Hitachi's calculation of the past due period. In response, Mr. Branch threatened to "hire a new service company to service our machines."

This email correspondence does not even include a promise to pay by Mr. Branch or anyone else at Horizon. Asked about alleged misrepresentations at his deposition, Mr. Cain identified representations by Horizon that payments would be made to Hitachi. Cain could not, however, recall any specifics as to time, content, or even precisely with whom he spoke.

> Q. These alleged false representations that you talked about with respect to payment on the service contracts, do you have personal knowledge of whether or not these alleged false representations were made by Daniel Branch?
>
> A. And I'm sorry that I confuse the two sometimes, the names Dave and Dan, but I believe the answer is yes, Dan - - Dan Branch.
>
> Q. What did he say? Did - - he said it to you?
>
> A. Well, I have had conversations with him in the past with - - regarding collections and we have been, you know, with him - - with respect to him telling us that we would receive payments, but some of the communications also came through not - - not only him, but I believe his business manager, some person in his business department I don't know.
>
> Q. Do you know that person's name?
>
> A. No, off - - not offhand I do not.

Q. Does the name Dan Hansen help you out at all?

A. We have spoken with Dan Hansen as well on occasion.

[* * *]

Q. You can't tell us as you sit here, though, the specifics of when any of those conversations would have taken place?

A. No, I cannot remember right now.

Q. Or the specifics of what would have been told to you?

A. No.

(Cain Dep., 41:17 – 42:25.)

This evidence fails to support the required element that the maker of the representation knew of, or acted with reckless indifference to, the falsity of the statement. Cain's testimony and the email communications provide no information whatsoever about Horizon's financial condition. Likewise, the August 2005 correspondence gives no hint of a fraudulent intent on the part of the Branches; rather, by all rights, it shows the existence of some delinquent accounts, Hitachi's efforts to collect on those accounts, and a dispute by Horizon regarding Hitachi's calculation of the amount of time any particular invoice was considered past due. Drawing all reasonable inferences in favor of Hitachi, Cain described nothing more than unfulfilled promises to pay, not fraud.

On top of Hitachi's failure to present evidence of a specific misrepresentation made with fraudulent intent in August 2005, this fraud allegation fails for at least one additional reason. This being at least the third post-contract occasion on which Hitachi claims it was "defrauded" into resuming service, the reasonableness of Hitachi's reliance also is at issue. The gravamen of Hitachi's post-contract fraud claim is that Horizon's promises of payment, made to

23

induce a resumption of service, were false and made with fraudulent intent. Even if evidence existed to support this contention (which, as discussed supra, it does not), Hitachi's reliance upon such representations, after Horizon's payment promises allegedly went unfulfilled on two prior occasions, would not have been reasonable. If, as Hitachi contends was the case, Horizon began making false promises to pay at least as far back as early 2004, Hitachi was or should have been aware of this tactic by August 2005. Thus, for Hitachi, a large corporation with the aid of sophisticated legal counselors, to fall for the same representations regarding future payment, even if made with no actual intention to pay, was completely unreasonable. Accordingly, Hitachi's claim of post-contractual fraud based on communications in August 2005 also fails for lack of justifiable reliance.

In sum, all of Hitachi's fraud claims against the Branches (both pre- and post-contract) fail because, among other reasons,[17] Hitachi failed to present any evidence that the Branches knew of, or acted with reckless indifference to, the falsity of the alleged misrepresentation, or that they acted with fraudulent intent. Accordingly, the Branches are entitled to summary judgment on Hitachi's fraud claims in Count XI of the Amended Complaint.

---

[17] In addition to the lack of evidence of fraudulent intent, several of Hitachi's fraud allegations are defective for one or more additional reasons. Such additional reasons are discussed in detail in the relevant subsections of this memorandum. It is unnecessary to reproduce those discussions here.

**III. Conclusion**

   For the foregoing reasons, the Branches motion for partial summary judgment is **GRANTED**. Judgment is entered in their favor on Count XI of the Amended Complaint. All remaining claims shall proceed.

   **IT IS SO ORDERED**.

Dated: October 29, 2008

            _____
            **HONORABLE SARA LIOI**
            **UNITED STATES DISTRICT JUDGE**